Exhibit A

THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| ALEXANDER BARRY, | ) |
| | ) |
| | ) KING COUNTY |
| Plaintiff, | ) CAUSE NO. 20-2-13924-6 SEA |
| | ) |
| v. | ) |
| | ) |
| UNIVERSITY OF WASHINGTON, | ) |
| | ) |
| Defendant. | ) |

## TRANSCRIPT OF AUDIO-RECORDED HEARING

BE IT REMEMBERED that the above-entitled matter came on regularly for hearing at the Maleng Regional Justice Center, 401 4th Avenue N, Room 4B, Kent, Washington.

**WEDNESDAY, JUNE 28, 2023**
**HELD BEFORE THE HONORABLE JUDGE JUDITH RAMSEYER**
**(PAGES 1-62)**

Proceedings recorded by electronic sound recording; Transcript produced by Anderson Transcription Solutions LLC

**APPEARANCES**

For the Plaintiff:     Daniel J. Kurowski, Pro Hac Vice
                       Hagens Berman Seattle Office
                       1301 Second Avenue, Suite 2000
                       Seattle, WA 98101
                       (206) 623-7292
                       dank@hbsslaw,com

                       Edward W. Ciolko, WSBA #985110
                       1133 Penn Avenue, Fifth Floor
                       Pittsburgh, PA 15222
                       (412) 322-9243


For the Defendant:     Karen G. Johnson-McKewan, WSBA #121570
                       Orrick Herrington & Sutcliffe LLP
                       405 Howard Street
                       San Francisco, CA 94105-266
                       (415) 773-5917
                       kjohnson-mckewan@orrick.com

                       Robert M. McKenna, WSBA #18327
                       Aaron Brecher, WSBA #47212
                       Orrick Herrington & Sutcliffe LLP
                       401 Union Street, Suite 3300
                       Seattle, WA 98101
                       (206) 839 4415
                       rmckenna@orrick.com
                       abrecher@orrick.com

                       Marc R. Shapiro, Pro Hac Vice
                       Orrick Herrington & Sutcliffe LLP
                       51 West 52nd Street
                       New York, NY 10019-6142
                       (212) 506 3546
                       mrshapiro@orrick.com

1                   **CHRONOLOGICAL INDEX**

2   **JUNE 28, 2023**                           **PAGE**

3   **Motion Hearing**

4   Plaintiff's Motion for Class Certification.................7

5   Oral Argument by the Defense.............................22

6   Rebuttal Argument.......................................40

7   Court's Ruling..........................................43

8   Certificate of Transcriber.............................62

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | SEATTLE, WASHINGTON |
| 2 | WEDNESDAY, JUNE 28, 2023 |
| 3 | MORNING SESSION - 9:09:20 A.M. |
| 4 | <u>MOTION HEARING</u>: |
| 5 | (The following proceedings were had in open Court before |
| 6 | Judge Judith Ramseyer:) |
| 7 | THE CLERK:  King County Superior Court is in |
| 8 | session.  The Honorable Judith Ramseyer presiding. |
| 9 | THE COURT:  With very bad eye-hand |
| 10 | coordination this morning, here I am.  Good morning, |
| 11 | everyone. |
| 12 | MS. JOHNSON-MCKEWAN:  Good morning, Your |
| 13 | Honor. |
| 14 | MR. KUROWSKI:  Good morning. |
| 15 | THE COURT:  We're here in the case of |
| 16 | *Alexander Barry v. University of Washington*, King County |
| 17 | cause number 20-2-13924-6, Seattle designation.  We're here |
| 18 | on the Plaintiff's Motion for Class Certification.  I |
| 19 | understand we have a good-sized crowd present, and so let's |
| 20 | begin with attorneys making your appearances for the record. |
| 21 | I'll also let you know that we are streaming this hearing on |
| 22 | YouTube so that individuals that are interested that -- that |
| 23 | are not on the Zoom link -- we don't want everyone to be on |
| 24 | the Zoom link -- can observe the proceedings. |
| 25 | So let's begin with counsel for the Plaintiff. |

1    If you would, please identify yourselves.

2                    MR. KUROWSKI:  Good morning again, Your Honor.

3    Daniel Kurowski for the Plaintiff.

4                    THE COURT:  Thank you.

5                    MR. CIOLKO:  Good morning, Your Honor.  Edward

6    Ciolko for the Plaintiff.

7                    THE COURT:  Thank you.  All right.  Welcome

8    to you both.

9                    And on behalf of the Defendant, University of

10   Washington?

11                   MS. JOHNSON-MCKEWAN:  Good morning, Your

12   Honor.  Karen Johnson-McKewan from Orrick on behalf of the

13   University of Washington, and I'll be arguing today.

14                   THE COURT:  Thank you, Ms. Johnson-McKewan.

15                   MR. MCKENNA:  Good morning, Your Honor.  Rob

16   McKenna on behalf of Defendant, the University of Washington.

17                   THE COURT:  Welcome.

18                   MR. SHAPIRO:  Good morning, Your Honor.  Marc

19   Shapiro on behalf of University of Washington also from

20   Orrick Herrington & Sutcliffe.

21                   THE COURT:  Thank you.

22                   MR. BRECHER:  Good morning, Your Honor.  Aaron

23   Brecher also of Orrick and also for the Defendant, University

24   of Washington.

25                   THE COURT:  All right.  Thank you very much,

1    everyone.

2              And, Mr. Kurowski, I believe I was notified

3    that you would be arguing on behalf of the Plaintiff; is that

4    correct?

5              MR. KUROWSKI:  A hundred percent correct, Your

6    Honor.

7              THE COURT:  Okay.  Thank you.

8              THE COURT:  Well, and I've reviewed all of

9    the materials.  There are a lot of materials.  I want to

10   thank you all for your thoroughness.  I particularly want to

11   thank you for sending additional authority, which, as you

12   know, our resources are limited; and it's very helpful to

13   have that provided.  So thank you.  I have reviewed all of

14   the materials.  I understand issues and the arguments that

15   the parties have raised, but I'm happy to hear your

16   underlining or emphasis on your arguments.

17             I'd like to try to confine your arguments to

18   about 20 minutes if -- if that's possible.  If that's not

19   possible, give me a heads up, and -- and we'll reassess as to

20   time limits.  We don't have a drop-dead limit, but there's a

21   lot of information here, and I -- I would like to keep these

22   proceedings concise.  All right?

23             MS. JOHNSON-MCKEWAN:  Your Honor, just for

24   clarification, you mean each side gets 20 minutes or 20

25   minutes total?

 1                     THE COURT:  Each side.  I'm sorry.  Yeah.

 2                     MS. JOHNSON-MCKEWAN:  I got you.

 3                     THE COURT:  Yeah.

 4                     MS. JOHNSON-MCKEWAN:  Thank you.

 5                     THE COURT:  I've budgeted about an hour or so,

 6     yes.

 7                     MS. JOHNSON-MCKEWAN:  Thank you.

 8                     THE COURT:  All right.  All right.  Any

 9     questions, then?  Good to go.

10                     Then, Mr. Kurowski, on behalf of the Plaintiff

11     and the moving party, would you like to begin?

12               PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

13                     MR. KUROWSKI: I would, Your Honor.  Thank you.

14     And, of course, by all means, if, during the course of my

15     discussion, Your Honor has particular questions as to

16     different points that I -- I make, based on your review of

17     the pleadings and perhaps some questions that you might have,

18     by all means, please -- please jump in.  You know, I'd much

19     prefer to address the questions that you specifically have

20     than, you know, ones that I think you may have which is where

21     my -- my presentation will ultimately stem from.

22                     THE COURT:  Okay.

23                     MR. KUROWSKI:  So that said, I will -- I'll

24     launch into it.  Faced with the COVID-19 pandemic, in March

25     2020 the University of Washington made a university wide

1    decision to close all of its campuses and transition all

2    students who were enrolled in in-person courses, on-ground

3    courses, and on-campus courses into online classes.  It also

4    made another decision as well:  No student would receive a

5    refund or a discount of tuition either.

6              Against this backdrop, class certification is

7    appropriate because this case absolutely involves decisions

8    which applied to each and every student in our proposed

9    class.  As a result, we think that this case should join

10   other cases that certified classes of students over many of

11   the same objections lodged by UW here.

12             We're looking -- for example, we point the

13   Court to the cases like University of La Verne as well as the

14   supplemental authority that Your Honor just mentioned, which

15   were both cases involving similarly large state schools, the

16   University of Delaware and Louisiana State University as

17   well.

18             As a threshold matter, the class certification

19   dispute that is before the Court is fairly narrow.  Really,

20   in our view, none of the Rule 23(a) elements are contested

21   and only some of the Rule 23(b)(3), predominance and

22   superiority elements, are contested.  Really, the dispute

23   focuses on one element and that's primarily that one of

24   damages.  And, ultimately, we believe that common issues are

25   going to predominate for the reasons that we've noted.

1           What stands out in our review of the motion

2    papers, Your Honor, is that both parties rely on common

3    evidence or arguments that are going to apply classwide.  The

4    defenses and arguments and issues and nits that University of

5    Washington raises so often apply to each and every student.

6    In such situations, class certification is the appropriate

7    way to resolve a dispute, particularly where, as here, we're

8    dealing with a university wide decision that impacted

9    students across the university.

10          Now, in terms of the class that we requested

11   the Court certify, what we've proposed is all students who

12   were enrolled in and paid for the University of Washington's

13   in-person-based educational programs and courses during the

14   winter quarter or spring quarter 2020 academic terms.  We --

15   we do make a couple of exclusions, and we think those are

16   important to emphasize here on the outset because, in UW's

17   opposition, it took some issues with the scope of our class,

18   and particularly the one that I would emphasize is the -- you

19   know, our focus is limited to students that are enrolled in

20   University of Washington's in-person educational programs.

21          So if you're a student that's enrolled in a --

22   in -- that was enrolled in some of the university's fully

23   online programs, because that's the choice that you made

24   voluntarily, those students would not be part of our -- part

25   of our class.

1           Additionally, we think, as Your Honor

2    approaches her ruling in this case and considers it, we want

3    to emphasize the standard of review and the liberal standard

4    that Courts apply in making Rule 23 determinations in

5    Washington.  And I think that's important here because

6    Washington Courts -- they're -- some of the cases that the

7    parties have cited are Federal cases that involve Rule 23.

8    And while Rule 23 is -- Federal Rule 23 cases are certainly

9    things that this Court can look to in making its decision, in

10   issuing its decision, Washington has a little more -- not a

11   little more, a lot more flexibility to the Court.

12           And so Washington courts liberally interpret

13   Civil Rule 23, and, you know, as the Court noted in *Odah v.*

14   *State*, the Washington Court of Appeals, the Court should err

15   in favor of certifying the class because the class is always

16   subject to the trial Court's later modification or

17   decertification.  And we think, particularly in the

18   circumstances here, where, you know, there's a lot of

19   material that's flown before Your Honor, some of which we as

20   Plaintiffs, let alone, I'm sure, the Court, haven't had an

21   opportunity to fully digest, particularly with respect to the

22   110 pages of opposition expert reports from -- submitted last

23   week.  We think that that's an important part to keep in

24   mind, but also one that provides flexibility to the parties

25   and the Court at this stage of the litigation where

1    litigation is ongoing, discovery hasn't concluded, and it's

2    ongoing.

3              Additionally, another point that we emphasize

4    that flows through the university's opposition to our request

5    for class certification involves what we view as a lot of

6    disputes as to ultimately the underlying merits of the case,

7    whether Plaintiffs can ultimately prevail on the merits of

8    their claims, and -- and that's not what the class

9    certification procedure is about, and that's not what the

10   class certification ruling is about.

11             And so, again, we have guidance from the

12   Washington Court of Appeals that says -- actually, the

13   Washington Supreme Court in *Washington Education Association*

14   *v. Shelton School District* that directs courts that, when

15   courts are deciding whether to certify a case as a class

16   action, the Court doesn't consider the merits of the case.

17   The parties seeking class certification need not demonstrate

18   the likelihood of ultimately prevailing.

19             And we really do think that that point matters

20   because, particularly as to some of the damages and expert

21   issues that UW raises, it runs afoul of that point.  In our

22   papers, we show how common evidence can be used to prove our

23   claims on a classwide basis.  Whether that evidence,

24   ultimately, Your Honor, is going to carry the day, it's a

25   question for another day.  But not only is it a question for

1    another day, it gets into questions for the jury.

2                    With respect to the Rule 23 elements

3    themselves as a -- as another threshold matter, we think

4    there's a question sometimes in Washington Courts with

5    respect to this issue of ascertainability, and so some courts

6    of -- in Washington have said that it is required.  Another

7    says that Rule 20 -- Civil Rule 23 has no such requirement.

8    You know, we've sort of erred on the side of the courts that

9    say that we should make that showing.  But regardless, we

10   think that we have met it here.  It simply requires objective

11   rather than subjective criteria.

12                    And, you know, certainly our -- our class

13   definition of identifying students who paid and who were

14   enrolled in University of Washington's in-person programs.

15   Doesn't involve any state of mind.  It looks to objective

16   issues, and it uses precise and objective criteria to

17   identify class members.

18                    The university's got records that identify who

19   were students enrolled in in-person programs.  Your Honor,

20   anecdotally, myself and my Co-Counsel, Mr. Ciolko, we've been

21   involved in a number of settlements of these types of cases,

22   and in all of those cases, we've had no issue identifying who

23   should get settlement awards under the case -- under the

24   settlements.  And in part two, we've also provided direct

25   notice to the students because the university keeps that

1    contact information such that we know how to identify those

2    individuals.

3              Civil Rule 23(a)(1), numerosity, low threshold

4    easily met here.  The Courts generally deem joinder

5    impracticable with just 40.  Here we're dealing with tens of

6    thousands of students.

7              Commonality under 23(a)(2), also another low

8    threshold test.  And really that exists here because much

9    like -- it's a situation where we have a course of -- where

10   you have a course of conduct that gives rise to the cause of

11   action that affects all the class members.  You have common

12   issues, and so also, too, we don't have to have commonality

13   as to every single issue in the case.  We can -- commonality

14   -- the -- the test for commonality is met in Washington with

15   just a single issue common to the quest class.

16             But, ultimately, here we -- we have multiple,

17   you know, whether the University of Washington had a contract

18   with its students to provide in-person instruction.  Did the

19   university breach that contract?  With respect to our

20   alternative unjust enrichment claim, did Plaintiffs make a

21   payment to -- did Plaintiff make a payment and the class make

22   a payment to the university?  Was the university unjustly

23   enriched by keeping the -- those payments?

24             With respect to Rule 23(a)(3), typicality,

25   again, we -- we -- this is another threshold that we think is

1    satisfied here.  The claims or defenses of the representative

2    parties need to be typical of the claims and defenses of the

3    class, and we really do think it does exist here where each

4    class member's claim arises from the same course of UW's

5    conduct, and that's the March 2020 campus closure, conversion

6    of all on-ground programs into online ones with no refunds.

7                 Adequacy is a -- under Civil Rule 23(a)(4), is

8    one that is uncontested as to counsel.  So backing up a

9    little bit.  Adequacy kind of looks to -- not kind of.

10   Adequacy looks to two different parts:  It looks to the

11   adequacy of the class representative as well as the adequacy

12   of class counsel to serve to protect the interests of the

13   class.

14                 There's no dispute here as to the adequacy of

15   class counsel, and -- and while it's contested somewhat, I'll

16   say, in terms of the adequacy of the class representative,

17   Mr. Barry, UW really only mentions it in connection with

18   predominance arguments, so -- as opposed to a stand-alone

19   argument.

20                 But, ultimately, Plaintiff satisfies the --

21   the test required under Washington because there are no

22   conflicts of interest that he has with the class.  And,

23   frankly, he's going to continue to do what he has done

24   already, and that's vigorously prosecute the action on behalf

25   of the class.  Plaintiff does have the same interests as

1    class members.  All were impacted by UW's move online with no

2    refunds.

3                    Now with respect to Civil Rule 23 -- before I

4    get into Rule 23(b)(3), anything Your Honor wants me to cover

5    with respect to any of those issues before I -- I shift gears

6    a little?

7                    THE COURT:  No.  I think I'm tracking, and

8    thank you.  You're welcome to move on.

9                    MR. KUROWSKI:  Okay.  Thank you.  With -- with

10   respect to Rule 23(b)(3) -- and -- and that's the

11   predominance and superiority elements of -- of the class

12   claim, and -- and this is where the dispute primarily rests

13   among the parties.  Under Rule 23(b)(3), we look to whether

14   the common questions of law that we looked to earlier

15   predominate as well as whether the class action is the

16   superior vehicle for resolving the claims at issue here.

17                    And -- and the answers to these questions,

18   Your Honor, that common questions of law and fact do, in

19   fact, predominate here.  And when we're dealing with proposed

20   claims of tens of thousands of students arising out of a

21   singular decision to close all campuses and provide no

22   refunds, a class action is far preferred to costly individual

23   actions.  Civil Rule 23's requirement involves -- requires

24   predominance of fact or law, and there's no dispute that

25   common issues of law predominate.  Only one state's law

1    applies here -- Washington -- and so really the dispute for

2    predominance is limited only to certain factual issues.

3                    Again, we want to emphasize the standard that

4    the Court must follow, particularly because it's something

5    that we've seen in UW's papers that they're again straying

6    away from.  Class actions don't require that every single

7    issue align across every single class member.

8                    As the -- the Washington Supreme Court noted

9    in the Chavez case, 190 Wash. 2d 507 at 519, the predominance

10   requirement is not defeated merely because individual,

11   factual, or legal issues exist.  A single common issue may be

12   the overriding one in the litigation despite that -- the fact

13   that the suit also entails numerous remaining individual

14   questions.

15                   And so we -- there are numerous questions that

16   really predominate for both of the causes of actions that

17   Plaintiff asserted.  So, again, the breach of contract claim;

18   did UW impliedly contract to provide students for an

19   in-person educational experience?  Did it expressly contract

20   to provide that experience?  If yes, did it breach that

21   contract?  And were the students damaged by that breach?

22                   For the alternative unjust enrichment claim,

23   did UW receive a benefit from students?  Did it receive money

24   from students?  Was that money at students' expense?  And are

25   the circumstances such that it would be unjust for UW to

1    retain the benefit?  We think those are all questions that

2    can be answered classwide.  We think they can be answered

3    with class-wide evidence and ultimately, at the end of the

4    day, the jury will decide whether we're right or wrong.

5              THE COURT:  I -- I do want to jump in here,

6    Mr. Kurowski, and -- and --

7              MR. KUROWSKI:  Yeah.

8              THE COURT:  -- just ask because you are right.

9    The University of Washington spends a fair amount of time

10   talking about the factual differences between students.  And,

11   for example, some students who were enrolled for in-person

12   classes may have actually preferred remote education because

13   of their own family circumstances or, you know, it ended up

14   being efficient, or they didn't use the IMA or the HUB or,

15   you know, labs or -- or those kinds of things.  So I -- I

16   understand your argument, but do you have any -- any direct

17   response to those kinds of arguments that have been raised by

18   the university?

19             MR. KUROWSKI:  Yeah, absolutely, Your Honor.

20   And so one of the parts that I would direct the Court to is

21   -- I'm trying to find it in my notes here.  Bear with me --

22   is in the University of Delaware case.  And so, for example,

23   in the University of Delaware case, one of the disputes was

24   essentially as to the value that the students ultimately

25   received, and -- and that's what some of the issues that the

1   university's arguments go toward -- that some students may

2   have preferred online learning.  Whether they preferred it or

3   not, Your Honor, ultimately doesn't answer the question.

4   They did not get what was ultimately bargained for in what we

5   said.

6               But, you know, it -- it kind of -- the

7   University of Delaware case did a good job of describing and

8   -- and answering this dispute.  And so the university said

9   that the value of the services it provided required

10  individualized proof.  So, for example, if you're looking at

11  things like, oh, did a student value in-person education more

12  or not.

13              And the -- the court answered that question by

14  saying that the fair market value of an online -- online

15  education does not vary by student.  The university protested

16  that some students got better grades in the spring 2020 than

17  other semesters, and -- and the court said, well, the fair

18  market value of an in-person education doesn't differ

19  depending on whether a student got better grades or not, nor

20  did it vary by how many times the student joined the youth --

21  youth clubs or how many times the student ended up in the

22  university health services.

23              And the court, I think, correctly reasoned

24  that, although those are services available to all students,

25  they're all available for the same fixed price and even

1   though students may make more or less or better or worse use

2   of those, that doesn't change the fair market value, and --

3   and we think that's particularly appropriate -- particularly

4   appropriate here.

5              And it's appropriate here as well when you

6   kind of look how universities set the pricing.  They don't

7   look to see what university -- what an individual student

8   thinks the value is of -- of the education.  The university

9   sets it for cohorts of students, thousands of people at a

10  time.

11             And I think, too, with respect to the damages'

12  issues, again, damages do predominate, Your Honor.  And I --

13  I see that I'm coming close to my 20 minutes already; so I'll

14  -- I'll make this final point in respect to the Court's time.

15             Even disputes among the parties as to the

16  extent, if any, of whether Plaintiffs in the class were

17  damaged doesn't mean that individual issues predominate.  And

18  so if we're looking at the *Elter v. United Services Auto*

19  *Case,* 17 Wash. App. 2d 643 at 660, the difference in the

20  amount of damages owed to individuals does not defeat the

21  point in that case that the Defendant didn't pay for --

22  didn't pay its policyholders in that insurance case.

23             And so, ultimately, the fact that

24  individualized damages may vary doesn't defeat commonality or

25  predominance, and it's possible to assess damages on a

1   classwide basis using representative testimony.  So

2   ultimately where, as here, we have, you know, numerous

3   central issues in the action that are common to the class and

4   that can be said to predominate, class certification is

5   appropriate, even if other important matters are going to

6   have to be tried separately, and not that we agree that they

7   would, but damages is certainly one of them that the Supreme

8   Court -- U.S. Supreme Court in -- in *Tyson* has recognized may

9   be peculiar to individual class members.  So --

10              THE COURT:  And -- and so let me just ask you

11  on that point, Mr. Kurowski.  Does that, then, address,

12  again, an issue raised by the University of Washington

13  that -- that some class members may not have paid the full

14  tuition even though their account is paid but because of

15  grants or gifts or other circumstances, you know, they --

16  they were not out of pocket.  So what they paid is -- is not

17  -- for example, Mr. -- it -- it's not the same as what people

18  who paid the -- the full tuition required for whatever

19  program they were enrolled in.

20              MR. KUROWSKI:  Sure.  I -- I think, again --

21  I'm going to approach that a couple of ways, Your Honor.

22  First, I think those are ultimately going to be merits issues

23  and when we're looking at who has the burden of what, it's

24  ultimately the Defendant's burden to prove any offsets, not -

25  - not Plaintiff's burden.  And so to the extent that the

1    university thinks that the damages should be less or they

2    should be offset by financial aid, that's the -- the

3    university's ultimate obligation in our view.

4                    Second, I -- I think it goes back to the

5    question of it's an issue that shows common issues and can be

6    applied on a classwide basis.  And so in -- I think it was

7    table 3 in Mr. Hansen's report.  He took the damages analysis

8    that our expert applied to Mr. Barry, our Plaintiff, and

9    plugged in an additional element into the formula, which we

10   would say would be applied classwide, and that additional

11   element was to account for the scholarship that Mr. Barry

12   received.

13                   And so it can be done.  It can be measured.

14   And, ultimately, at the end of the day, you know, we believe

15   that, you know, if a class member does have zero damages

16   ultimately, it -- it still doesn't change the fact that they

17   -- even if -- let me rephrase.  If the -- a class member,

18   through the application of -- of grants and -- oh, grants

19   applies -- you know, it is still a classwide issue that can

20   be determined using the same methodology and formulation.

21                   I'll say one other thing on this point before

22   I conclude.  In the Louisiana State University case that we

23   submitted to Your Honor, the idea that -- one of the

24   arguments that LSU made was that financial aid that the --

25   the Plaintiff received should reduce or offset her damages,

1   and so they made some -- the university made some offset and

2   double recovery arguments.

3                    And -- and so the court rejected that, and it

4   said -- it, you know, basically reflected a fundamental

5   misunderstanding of how financial aid works, and it

6   misapplied the law.  And the court said that if a jury were

7   to determine that Louisiana State University's in-person

8   tuition or fees should have been discounted for the latter

9   half of the spring 2020 semester, that discount would have

10  resulted in an overpayment to the university, and a refund of

11  that overpayment would have flowed directly to the Plaintiff

12  to cover other costs of attendance expenses that the student

13  would have for the -- the semester.

14                   So with that, barring additional questions

15  that Your Honor may have of me following Counsel's argument,

16  then, thank you for your time.

17                   THE COURT:  Thank you, Mr. Kurowski.

18                   Ms. Johnson-McKewan?

19                   ORAL ARGUMENT BY THE DEFENDANT

20                   MS. JOHNSON-MCKEWAN:  Thank you, Your Honor.

21  I'm going to try to focus on that damages question and the

22  the -- the damages calculation methodology that -- that the

23  Plaintiffs have offered.  We have said what we need to say on

24  the numerosity, typicality, adequacy points in our papers,

25  and -- but I do want to focus on the predominance question,

1    which encompasses, you know, superiority, manageability, and

2    commonality to some extent.

3              So -- so I'm focusing on Rule 23(b)(3)

4    primarily.  The legal requirements for predominance under the

5    *Comcast* case is that Plaintiffs must do more than merely

6    allege the predominance of common issues; they have to

7    demonstrate it by a preponderance of the evidence, and I

8    think Counsel recognized that when they submitted Dr. Cowan's

9    report in their reply papers.

10             *Comcast* also tells us that the Court needs to

11   engage in a rigorous analysis in evaluating that showing, and

12   that analysis is more demanding than the analysis under Rule

13   23(a), and the Court should consider the merits to the extent

14   necessary to perform that rigorous analysis of whether

15   23(b)(3)'s requirements are met.

16             And under the *Walmart* decision of the Supreme

17   Court, it's not merely -- it's not enough merely to raise

18   common questions.  Those questions must also be susceptible

19   to common answers across the class, and I think that's true

20   everywhere.  Otherwise, you -- you lose the -- the

21   predominance of common -- common issues -- common resolution

22   of issues.

23             So we're going to focus today primarily on

24   Rule 23(b)(3), and the Plaintiff must show that the -- there

25   -- the existence of individual injury resulting from the

1    alleged wrongs and that it is capable at proof of trial

2    through evidence common to the class rather than individual

3    to its members, and the damages need to be measurable on a

4    classwide basis through a common methodology.

5                    And we cited other cases *Blackie v. Barrack*

6    and *Britton v. Servicelink* for the proposition that damages

7    can be determined classwide only where the Plaintiff's

8    methodology renders the computation virtually a mechanical

9    task, and the Plaintiff's showing through Dr. Cowan's report

10   doesn't come close to meeting these standards.  His damages

11   methodology does not establish the existence of damages

12   across the class or a common methodology for measuring those

13   damages, let alone one that is virtually mechanical in its

14   operation.

15                    So -- so the questions are is there a

16   classwide and common answer to the question whether every

17   member of the class suffered damages?  And is there a

18   classwide and common answer to the question of how damages

19   can be measured here?  And the answer to both questions is

20   no.

21                    Now we all know the central challenge in this

22   case, as in many of the other student COVID class actions

23   around the country, is that the Plaintiffs must present a --

24   in this case, a single common answer to the question of what

25   was the value of online education to students at the

1    University of Washington during the first months of the

2    pandemic.

3              It's important to focus on the University of

4    Washington because that is, after all, the -- the education

5    that we're valuing here, and we have to recognize that every

6    university is unique.  So if we're going to determine the

7    value of an online education at the University of Washington

8    at the end of winter quarter 2020 and all of spring 2020,

9    that's the education we need to value, not what's delivered

10   somewhere else.

11             Moreover -- and this is a super critical point

12   -- it's really important to determine the value of that

13   education starting in March of 2020 because the case law

14   makes clear that any damages valuation needs to be tied to

15   the time of the purportedly wrongful act.  And we all know,

16   as we lived through it, that March of 2020 was a unique

17   moment in time, particularly in Washington which was where

18   the first U.S. COVID case was diagnosed.

19             And I think it's really easy for us to forget

20   just how scary that moment was for all of us; so I'm going to

21   remind us all a little bit about what was going on then.  The

22   only things anybody really understood about COVID in March of

23   2020 was that it was highly contagious, that it was spread by

24   people who showed no symptoms, and that it was killing

25   people.  By the end of March, 5,000 people in the U.S. had

1    died.  That's, you know, about a month into when the public

2    health emergencies were declared.

3                    People were staying home.  Streets in cities

4    were empty.  People hoarded household goods.  They were

5    sanitizing their groceries before they brought them into the

6    house.  They were doing the same thing with their mail.

7    Major League sports suspended their seasons.  Theaters shut

8    down.  Stock markets plunged.

9                    New York City started using freezer trucks to

10   hold the bodies.  To say that our collective fear of public

11   places was high at that moment in time would be a huge

12   understatement, and I think we've kind of gotten comfortable

13   with this and forgotten about it, but we need to go back in

14   time.  And this is a long way of saying that if there was

15   ever a time when you wanted a market valuation that was tied

16   to a moment in time, this is it.

17                   And we've cited case law that requires it:

18   *Freebee v. Supanchick* (phonetic) and *Mathews v. Heiser*

19   both -- both say that's when you have to perform the

20   valuation.

21                   And in this case, the things that we're

22   purportedly valuing in the first months of that pandemic were

23   the value of an in-person education and the value of a remote

24   education.  One was safe during a period of high risk and

25   high fear, and one was not.  And not only was in-person

1    education unsafe, it was not available anywhere.  So any

2    legally and logically sound market valuation has to take

3    those factors into consideration.

4                    So let's look at how the Plaintiffs have

5    attempted to answer that question -- what was the value of

6    online education at the University of Washington during the

7    first months of the pandemic?  They engaged an expert,

8    Dr. Charles Cowan.  He's been -- he has been involved in

9    other cases as well, and he ostensibly tries to answer that

10   question.

11                   He opines that there is a difference in value

12   between in-person and online education, that it can be

13   calculated with precision, and applied consistently to every

14   member of the class.  And that difference in value, Dr. Cowan

15   says, is the measure of every class member's damages.  That's

16   his analysis, but there's a lot of problems with it.

17                   So let's go through what his -- his syllogism

18   is.  He starts with the proposition that the true value of an

19   in-person education at the University of Washington is what

20   the university charges out-of-state students.  Then he

21   disregards what the University of Washington charges for

22   online education because he observed identical pricing across

23   online and in-person programs, and for reasons he doesn't

24   fully explain, he didn't trust that information; so he

25   excluded it from his analysis.

1          Instead, he selected 11 other universities

2   that he deemed comparable to the University of Washington,

3   and he compared the pricing differentials there between

4   online and in-person education, and he looked exclusively at

5   undergraduate programs.  He didn't look at professional

6   degree programs or graduate school programs.  And using those

7   pricing differentials, he derived a ratio of the value of

8   online versus in-person, and he finds, at the low end of

9   those 11 schools, tuition for online programs at the

10  University of Iowa costs just 27 percent of what it charges

11  for in-person education.

12          And at the high end, he found two schools:

13  University of Hawaii and University of Michigan, where they

14  charged the same, a hundred percent, online and in-person

15  both the same charges.  So our expert, Mr. Hansen, performs

16  those calculations on table 6 of his report.

17          And then what -- what Dr. Cowan does is he

18  takes those ratios that range from 27 percent to 100 percent,

19  and he derives an average from that of 56.6 percent, and

20  based on that, he concludes that the value of an online

21  education at the University of Washington is worth 56.6

22  percent of the tuition that UW charges to nonresident

23  students.  That's his calculation.

24          So there's a ton of problems with it.  We've

25  tried to lay them out in our surreply, but I want to start

1  with the very first step which is that, in the real world,

2  tuition is not a proxy for value.  He assumes that the value

3  of an education to any given student is measured by the

4  highest price the university charges any student for that

5  education and in this case the nonresident tuition rates.

6           And that premise is just fundamentally wrong.

7  It treats the bargain between students and university as just

8  the same as buying a ticket to Disneyland or the Wild Waves

9  Water Park, and those are obviously apples and oranges.

10          So one of our expert reports is from Dr. Sarah

11 Turner, who is a highly regarded economist at the University

12 of Virginia.  She specializes in the economics of higher

13 education, and she opines that the value to students of a

14 post-secondary education is better understood as a long-term

15 investment, the value of which cannot be measured

16 instantaneously but has to be measured over time by reference

17 to things like employment outcomes.

18          And she explains that the value that any given

19 student actually derives from an education depends

20 substantially on the effort and talents that those students

21 apply to their education and the courses that they choose.

22 So Dr. Turner's opinion has the virtue of being intuitively

23 correct -- that the value of an education is how it equips

24 students to function in the world, how they -- how -- how it

25 equips them in their chosen careers, how it equips them to

1    operate as citizens; and the value that students derive

2    depends a lot, not exclusively but a lot, on their own

3    efforts.

4                So for these reasons and a number of others

5    that Professor Turner lays out in a lot more detail,

6    Dr. Cowan's use of tuition as a proxy for value is a

7    completely artificial construct that doesn't have any

8    connection to the real world of post-secondary education.

9    It's a fiction and because of that, it cannot and does not

10   fit either the facts or the theory of liability on this case.

11               But I'm going to go on.  Even if we accept the

12   fiction that tuition can be used as a proxy for value,

13   Dr. Cowan's analysis doesn't come close to meeting even basic

14   valuation standards.  He acknowledges that people value

15   things by reference to other things all the time, and we

16   agree they do that.  But -- but what Dr. Cowan doesn't do is

17   that any valuation that's performed using comparables needs

18   to account for the differences between what's being valued

19   and the comparables that are being used as a benchmark or a

20   reference.

21               Mr. Hansen's report includes some detailed

22   description of what the -- what that requires and what the

23   professional standards are associated with performing this

24   kind of valuation, and I commend reading that to -- for the

25   Court, which is around paragraphs 33, 34.

1               Dr. Cowan doesn't perform any analysis to

2     assure that the online programs that he -- that he valued at

3     the 11 other schools are in any way comparable to the

4     education that the University of Washington -- Washington

5     delivered in the spring of 2020, let alone adjust for any

6     differences in -- in those programs.

7               I mean, the mere fact that he calculated

8     valuation ratios for online education ranging from twenty-

9     seven percent all the way up to a hundred percent in the 11

10    comparable schools is just a huge red flag.  How can those

11    programs be comparable to one another, let alone to the

12    University of Washington?  He didn't perform any

13    investigation to account for that wide variability which

14    means there must be -- because there is such a wide

15    variability, there must be something to account for those

16    differences other than the modality of instruction.  There

17    has to be something else going on that he doesn't

18    acknowledge.

19              He also rejected data that was available from

20    the University of Washington because he -- for reasons that

21    he doesn't fully explain, but obviously those programs are a

22    much better -- I mean, if you're going to use tuition as a

23    proxy, you should use tuition as a proxy at the institution

24    that -- whose -- whose education you're valuing, and he

25    doesn't do that, and he doesn't explain why.  And some of the

1    reasons that he offers for why he rejected the University of

2    Washington's pricing also apply to some of the schools in his

3    11, and he -- yet he uses the 11 and not the University of

4    Washington.

5                And this goes back to my point earlier about

6    how scared we all were in March of 2020.  He uses tuition

7    dates that predate the pandemic.  So he's required to use the

8    valuation methodology -- his valuation methodology should be

9    measuring at the moment in time that the breach or, you know,

10   unjust enrichment, in this case, occurred; but he doesn't do

11   that.  And he doesn't consider the prices at any of those 11

12   schools at that moment in time, but that was the market at

13   the time.

14               And the reason this is important is it kind of

15   relates to the question -- the first question that you asked

16   Counsel.  Is it, by failing to consider prices being charged

17   by other institutions in March of 2020, he failed to consider

18   whether students themselves placed any value on continuing

19   their education safely during the pandemic?  And there's

20   considerable reason to believe that students did value safety

21   in spring of 2020.  They could have withdrawn with no

22   financial penalty, but they opted to go forward at the

23   tuition levels that the University of Washington was

24   charging, and they did the same in the summer and the fall

25   quarters of 2020.

1           So by choosing prepandemic tuition levels for

2  his analysis, Dr. Cowan doesn't take into account or control

3  for circumstances that were dramatically changed in March of

4  2020.  He also looks only at undergraduate programs but

5  applies them consistently to graduate and professional degree

6  programs as if they're the same.  He doesn't compare the

7  programs in the 11 schools to -- in his analysis to the

8  programs available at the University of Washington, some of

9  which have are -- have no counterpart at the University of

10  Washington.  And, in fact, about half of the University of

11  Washington's undergraduates are enrolled in programs that are

12  nowhere to be found in the schools that Dr. Cowan sampled

13  from.  Now just because --

14           THE COURT:  Let me just jump in,

15  Ms. Johnson-McKewan.

16           MS. JOHNSON-MCKEWAN:  Yes.  Uh-huh.

17           THE COURT:  I wanted to ask you a -- a

18  question.  As I understand it, for the March quarter anyway,

19  there were only something like 30 days left in the quarter

20  when the school moved to online programming; is that right?

21  And so any tuitions paid would have been paid upfront and

22  before this --

23           MS. JOHNSON-MCKEWAN:  Yes.

24           THE COURT:  -- as you aptly describe this

25  catastrophe sets -- sets in.  Some of the things you've

 1   described, however -- don't they go to the legal question,

 2   the breach of contract impossibility, you know, that -- that

 3   -- do they not go to those legal issues?

 4                 MS. JOHNSON-MCKEWAN:  I'm happy to address

 5   those -- those questions, Your Honor.  What happened was that

 6   -- that the university switched to an all online format at

 7   the very end of winter quarter 2020 and announced before the

 8   start of spring quarter 2020 that they were going to do all

 9   online then, and there was a period of time during which

10   students had the ability to withdraw without any financial

11   penalty, and they chose not to.

12                 THE COURT:  Okay.

13                 MS. JOHNSON-MCKEWAN:  Now, the question of how

14   these things relate to the merits, they do relate to the

15   merits, but they also really do relate to this question of

16   whether there is a common means of assessing damages across

17   the class and when I -- and I -- I agree.  The -- the notion

18   of whether the terms of the contract for spring 2020 included

19   remote is a -- is a live question in this case, and it does

20   go to the merits, but it also goes to the question of the

21   valuation methodology that Dr. Cowan has used because he's

22   not taking account of the circumstances that were in effect

23   in March of 2020.  And because he doesn't do that, his

24   valuation methodology is unreliable.  And if you do take

25   account of those things, it's a highly individualized

1      inquiry.

2                      Did students make the choice for the reason

3      that they wanted to be safe?  Did students make the choice to

4      continue because they were already doing online education?

5      Because there were a large number of students who were

6      already doing online education?  Were they making the choice

7      because they had -- you know, they had courses that were

8      relatively unaffected by the switch from a lecture format to

9      in-person.  There's just a lot of individualized inquiries,

10     and Dr. Cowan's analysis doesn't take account or control for

11     any of those factors.

12                     And I -- I would commend Your Honor to reading

13     the *Omori v. Brandeis University* case, because that case,

14     which was decided, I think, just in May of this year,

15     actually addresses Dr. Cowan's analysis, which he applied in

16     that case as well.  The court found many of the same problems

17     that I've identified.

18                     The chief problem was that he -- is -- that he

19     assigned a consistent value across every discipline, every

20     graduate-undergraduate professional degree program.  He

21     applied his analysis consistently even though in the real

22     world we all know there are differences.  He didn't take

23     account of differences in coursework and that kind of thing.

24                     So that court refused to certify the class

25     because the -- the methodology that the Plaintiffs were

1    advocating for did not meet the requirements of predominance,

2    and -- and it was clear that there were significant

3    individual issues that would have to be addressed.

4              I want to touch on a couple of other things --

5    I know I'm running short here -- is that Dr. Cowan's analysis

6    would, in fact, compensate students who would -- who suffered

7    no damage at all under his analysis.  So, again, if we start

8    with that fiction that the true value of an education is what

9    the University of Washington charges nonresident students,

10   let's do the math.

11             The nonresident's tuition for undergraduates

12   in spring 2020 was $12,357.  56.6 percent of that number is

13   $6,994.  So any student who paid less than that, by

14   Dr. Cowan's own analysis, would not have been damaged.

15             Resident undergraduates at the University of

16   Washington, who make up about 70 percent of the class, paid

17   $3,457 in tuition in spring 2020.  So Dr. Cowan's analysis

18   tells us that resident students receive nearly twice the

19   value of what they paid for in spring 2020.  Those students,

20   by Dr. Cowan's own analysis, were not damaged at all.  So

21   they can't say that the value of an online education at the

22   University of Washington is worth only 56.6 percent of

23   whatever sum students actually paid in spring 2020 because

24   that renders the notion of value completely meaningless.  It

25   means we don't know what the value of the education was

1    because it's different for nonresident students than it is

2    for resident students.  It's different for graduate students

3    and undergraduates.  It's -- it's -- there's no -- there's no

4    sense to that.  So -- and we know that 70 percent of the

5    class paid less than that 56.6 percent of nonresident

6    tuition.

7                    We've talked a little bit about financial aid.

8    Dr. Cowan says his model can be readily adapted.  I think

9    that's his -- his wording -- can be readily adapted to

10   account for things like aid and third-party resources that

11   students may have received, but he doesn't explain what that

12   adaptation would entail.  He doesn't -- he doesn't explain

13   how you would do that, you know, across the class in a common

14   way, and it doesn't take account of a peculiarity associated

15   with Federal financial aid that the Court needs to be aware

16   of.  It's -- it's covered in our expert reports.

17                   Federal financial aid for individual students

18   is calculated based on a very complex formula that includes,

19   among other things, how much tuition they are being charged.

20   If there is a refund as a result of this litigation, that

21   Federal financial aid needs to be recalculated and -- and

22   then it falls.  It's a complicated formula, and you'd have to

23   do it student by student.

24                   And -- and Dr. Cowan's analysis, even though

25   he says it can be readily adapted, does not explain how it

1    can be readily adapted, and so the Plaintiffs haven't

2    actually met their burden with his report to address that

3    point.  And, of course, all of that assumes it's possible to

4    ascertain the source of funds that the students used, and

5    it's not always apparent from the -- to the university where

6    the funds came from.

7                    One -- one last point if -- if Your Honor will

8    bear with me.

9                    THE COURT:  Yes, please.

10                   MS. JOHNSON-MCKEWAN:  So calculating any loss

11   in a value in the -- at the end of winter and all of spring

12   2020 would still require a lot of individual analysis.  It

13   ignores -- the -- the methodology that's been proposed

14   ignores the fact that thousands of students in winter and

15   spring 2020 were enrolled in classes that had always planned

16   to be entirely online or a hybrid with a substantial online

17   component.  That's not -- it's not that they were in programs

18   that were entirely online.  They were taking individual

19   classes that were online.  Those students can't claim harm

20   with respect to those courses in a transition to online only

21   education because they were already learning that way.

22                   But -- but Dr. Cowan's methodology doesn't do

23   a course-by-course analysis which, you know, obviously would

24   be highly individualized.  So it doesn't even attempt to

25   measure the harm or the reduced harm that those students

1    could theoretically claim by virtue of the transition to

2    online.  And he also proposes calculating for winter quarter

3    when -- which is when the first online only order was issued.

4    He proposes calculating damages from March 9th to March 20th,

5    but a lot of classes finished before March 20th.  And he --

6    his analysis doesn't account for that either.  It doesn't

7    account for -- it doesn't have any means of identifying which

8    students ended their coursework when.  And that, of course,

9    would be a highly individualized inquiry.

10                   Of course, he doesn't propose a method for

11   offsetting financial aid or other third-party funding.  He

12   says it would be easy.  He doesn't explain how, and, in fact,

13   it would be a highly individualized analysis to figure out

14   how each individual student was affected in addition to all

15   of the other points that I've raised.

16                   So for all of these reasons, as well as those

17   articulated much more, you know, methodically in our -- in

18   our briefs and in our expert reports of Professor Turner and

19   Mr. Hansen, we'd ask the Court to deny class certification

20   for failing to meet the requirements of Rule 23.

21                   This -- this trial, if there is a trial, will

22   devolve into, you know, 56,000 individual questions of

23   whether students were harmed at all and, if so, by how much.

24                   THE COURT:  Thank you.

25                   Mr. Kurowski, do you want to give me a very

1    brief reply and particularly as to this issue of valuing harm

2    and the -- the issues that were raised by the university on

3    that point and Dr. Cowan's report?

4                          REBUTTAL ARGUMENT

5                    MR. KUROWSKI:  Absolutely, Your Honor.  I'll

6    say that the arguments the Defendants have -- has raised are

7    not unique to this case.  They are arguments that have been

8    offered by university after university in these types of

9    cases, including *La Verne* case, in which Dr. Cowan was one of

10   the experts, as well as the *Delaware* and *Louisiana State*

11   cases as well.

12                    Under Washington law, Courts evaluating --

13   Courts evaluating damages or ultimately the jury evaluating

14   the damages -- their job is to ultimately determine the sum

15   of money that will put the Plaintiff in as good a position as

16   if the Plaintiff would have been if both the Plaintiff and

17   the Defendant had performed all of their promises under the

18   contract.

19                    In -- in this case, Your Honor, Plaintiff has

20   performed all of his promises, and the only one that we're

21   alleging that hasn't provided all of the promises is the

22   University of Washington.  And so determining what those

23   damages are, you're forced to look at what is required to

24   place that -- that -- the injured party, which here is only a

25   Plaintiff, in the same financial position that he would have

1    enjoyed in the absence of a breach.

2                    Really, the way that higher education values

3    and markets products is through the tuition and fees.  And

4    with those tuition and fees, students are paying for access

5    to a suite of promised services.  That's the product.

6    Schools compete, in part, based on the cost of tuition.  For

7    example, we have 30(b)(6) deposition testimony that, in

8    evaluating tuition, one of the things that the University of

9    Washington looks at is how other schools are pricing because

10   it does matter ultimately.  And that's why it's appropriate

11   for Dr. Cowan to look at the tuition and fees that -- that

12   were charged to -- to the university.

13                   Ultimately, yeah, I think with respect to, for

14   example, that timing and effect of COVID, and we have to

15   measure it in this exact amount of time, one, I -- we rebut

16   that because the prices have already been set, I think,

17   several years in advance or at least a year in advance.  So,

18   for example, the University of Washington knew the whole

19   2020-2021 school year tuition pricing before the semester

20   even started, and there was a long process that it engaged in

21   before those amounts were determined.

22                   But I think ultimately here Defendants are

23   complaining that we haven't met our burden, but it's pure

24   speculation on Defendants and their experts' part that -- and

25   the Defendant and their experts didn't actually identify what

1   additional value, if any, COVID-19 online education did or

2   did not provide.  And, ultimately, that's not enough to sway

3   the Court from erring on the side of class certification as

4   the Appellate Court directs.

5               And, again, I really do think that -- that is,

6   you know, a quintessential merits issue that, you know, if --

7   if the University of Washington thinks that education in --

8   during COVID should be valued more than non-COVID, that's a

9   great argument for a jury.  That's a great argument for

10  cross-examination of Dr. Cowan, but ultimately, we don't

11  think that that's one that would bar class certification

12  here.

13              Really, so much of what they've argued and

14  what Counsel just argued now goes to the -- the inputs and

15  the sufficiency of the inputs by Dr. Cowan.  And -- and

16  Washington Courts are clear, for example, *Tokarz v. Ford*

17  *Motor Company*, 8 Wash. App 645 at 653.  The thoroughness of

18  an expert's examination of the evidence is a matter of weight

19  for the jury, and -- and, ultimately, it's within the

20  province of the jury to accept or reject in whole or in part

21  an expert's opinion.

22              But what we do believe is that, you know,

23  Dr. Cowan and Plaintiffs have -- we've satisfied our burden

24  at this stage of the case and respectfully request that the

25  Court grant our Motion for Class Certification.

```
 1                   THE COURT:  All right.  Thank you.

 2                        COURT'S RULING

 3                   THE COURT:  Well, thank you for your argument.

 4    You've been very thorough.  I am prepared to give you my oral

 5    ruling here, and I want to give you my ruling because -- some

 6    of you may know -- I am actually retiring from the bench

 7    Friday, and so there is not a lot of time for me to take this

 8    under further advisement.  And -- and, also, I -- I know the

 9    value of you having a decision and being able to -- to

10    address the issues that creates for you and move on from

11    there and make certain decisions, and if I -- if it were to

12    take me a longer period of time to go back to the drawing

13    board and prepare a thorough written decision, I'm not

14    entirely sure when you would get that.

15                   And so I have studied the -- these issues.  I

16    have reviewed the documentation that you've provided, and I

17    believe I am fully prepared to give you my rulings on the

18    motion.  As everybody knows, as you set out, this is guided

19    by Civil Rule 23 and to certify a class, the -- the

20    Plaintiffs need to meet all four factors that are raised in

21    subsection (a) and -- and (1) of the three factors that are

22    raised in subsection (b) that deals with primarily the

23    predominance of -- of common questions, and that is where the

24    Defendant has primarily focused its argument.

25                   Let me begin by saying the Defendant clearly
```

1    opposes the Certification Motion because these elements are

2    not met and -- and addresses a number of them but also raises

3    two other bases that I want to quickly address:

4                    And -- and one of them is that a class action,

5    under these circumstances that the university characterizes

6    as refunds to the students, are not allowed under Washington

7    law and -- and cites to RCW 28B.15.600.  Let me restate that

8    -- 28B.15.600 because that statute addresses how and when

9    refunds are provided to students by the university.

10                   And the university relies on *Lacey v. Nursing*

11   -- *Lacey Nursing Center v. Department of Revenue* which found

12   that, in that case, excise tax refunds were not eligible for

13   class certification because the -- the statute relevant in

14   that case didn't specify the conditions under which an -- a

15   business would be eligible for a refund and that those --

16   those requirements had to be met and that the statute itself

17   didn't, then, additionally authorize refund being sought

18   through class certification.

19                   I -- I find that that situation is very

20   distinguishable, and other -- other authority exists for

21   that, that the *Lacey Nursing Center* case is -- has been

22   narrowly construed that it does relate to -- excise tax and

23   taxation issues are typically narrowly construed and -- and

24   that here we really aren't dealing with a refund situation.

25   This is -- the Plaintiffs allege damages that would be

1   warranted if they establish breach of contract or unjust

2   enrichment claims and that those kinds of claims -- breach of

3   contract claims, quasi contract, other actions seeking

4   damages against the University of Washington -- are routinely

5   allowed.  And so I don't find that the argument relating to

6   the Lacey Nursing Center authority prevents class

7   certification in this case.

8                  Defendant also throws in -- and it's -- it's

9   very -- you know, I -- I don't think a lot of weight has been

10  placed on this but also raises the argument that -- that the

11  Plaintiff is alleging educational malpractice, and in

12  Washington that is not a cause of action.  But -- but that

13  really is not -- and Plaintiff describes this in its briefing

14  -- that really is not the basis for any of its allegations

15  here.  It's not based on educational content, per se, but in

16  the experience and opportunity of students who allegedly did

17  not get the benefit of the -- of the on-campus in-person

18  education that they had paid for.  And so I don't find that

19  that argument also would prevent class certification here.

20                  So I'm going to move on then to CR 23 and

21  first address the requirements of 23(a).  I -- I agree with

22  Mr. Kurowski when he says that the Defendant really doesn't

23  challenge the numerosity, finding clearly the evidence, at

24  this point anyway, indicates that there's something over

25  56,000 students who may have been registered for on -- in-

1   person coursework during the relevant period of time -- the

2   end of the winter quarter, the 20 days or whatever it is in

3   March 2020, and the spring 2020 quarter.

4              And -- and that joinder of -- of that number

5   of individuals in a -- an individually based litigation or --

6   or to not proceed through the class vehicle would -- would

7   not serve judicial economy or -- one of the principles of

8   class certification is to allow large numbers of people to

9   see relatively small recoveries that otherwise they wouldn't

10  be -- have the financial wherewithal or perhaps even the

11  interest to pursue.  And that those underlying bases that

12  justify the class certification also are indicated here when

13  we have such a potentially huge number of people involved in

14  the class.

15             The second element of 23(a) -- Section 23(a)

16  is commonality.  And the question here is whether there are

17  questions of law or of fact that are common to the class.

18  Here again, typically this is not considered an extremely

19  high bar.  And, as Mr. Kurowski says, in Washington the law

20  establishes a more liberal preference for class certification

21  than under Federal law, although obviously I think still it

22  requires a careful consideration of each of the elements that

23  must be established.

24             But here I do agree with the Plaintiffs

25  that -- that it -- Mr. Barry or the alleged class members

1    have asserted common questions that would apply classwide and

2    -- and they are whether class members and the University of

3    Washington had a contract.  Was there a contract between

4    them?  If, under that contract, the university was obligated

5    to provide in-person classes or access to in-person

6    facilities at the university; whether it, the university,

7    breached its contract by changing the -- the terms of the

8    contract and -- and moving all class activity to remote and

9    -- and not allowing them use of the in-person facilities or

10   the labs or the other facilities that were part of the

11   alleged contract; the benefit between the parties; whether

12   the university unlawfully kept the full tuitions that were

13   paid by class members and -- and therefore was unjustly

14   enriched.  They got a benefit by the payment, and -- and they

15   were unjustly enriched by retaining that full benefit; and

16   then the fact of -- and measure of damages.

17                  And -- and all of those questions of law do

18   apply, in my mind, across the board to the -- the class

19   members -- the absent class members and Mr. Barry.  The

20   university really doesn't challenge that -- these common

21   legal issues, but it -- it does raise numerous issues that --

22   of fact that are dissimilar across class members.

23                  But at this point, I -- I think that is

24   really, you know, much more focused on the predominance

25   issues and the -- assessing the harm issues, and I'll address

1    that more there.

2              I think it has been met that the university's

3    alleged course of conduct is common to all class members and

4    does give rise to the alleged breach and the damages that are

5    sought by all class members and that this does satisfy the

6    commonality aspect of 23(a)(2).

7              The next element is -- under 23(a)(3) is

8    whether the claims or defenses of the representative party

9    are typical of those of the entire class.  And -- and here

10   again, I find that -- that they are.  And, yes, the

11   university raises arguments that -- that individual's

12   experiences with the transition to online services varied,

13   and some may have actually benefited from it or enjoyed it or

14   that he was different because he was in a fee-based program

15   versus a tuition program.  He was a graduate student rather

16   than an undergraduate student.

17             But I -- I think that many of these arguments

18   really do stray into the merits of these questions.  The

19   class representative will have to prove -- the Plaintiffs

20   will have a burden of proof to prove the -- the fact of

21   damages and -- and whether or not the class got what they

22   bargained for with the contract or were damaged in -- in some

23   way by the move to online programming, and the university

24   will have the opportunity, obviously, to raise all of these

25   issues that for certain people it was preferable to -- to

1    participate remotely from home or -- or wherever they were or

2    that they didn't lose any benefit by not being on campus, but

3    I do think that has more to -- that goes more to the merits

4    of the arguments than -- than whether or not the common

5    issues predominate here.

6              The case law is clear that there doesn't have

7    to be complete identity between the individual class members

8    in terms of their individual experiences but only if there is

9    a predominance of the claims that are typical to the legal

10   theories and the class.  And -- and here I do find that they

11   are, given that across the board the same legal theories are

12   raised, the same assertion of harm is made, and the same

13   requirement of proof of damages will apply classwide.

14   Whether or not the Plaintiffs are able to prevail in that

15   proof is not a question that needs to be answered on the

16   certification question.

17             The last element of 23(a) is the fourth

18   element -- is whether or not the class representative, in

19   this case Alexander Barry, will fairly and adequately protect

20   the class.  And -- and there are actually two parts to this,

21   and it's both the individual representative as well as the

22   class Counsel being able to adequately represent the class.

23             And the -- the arguments in terms of -- that

24   the Defendant has raised in -- in terms of graduate students

25   or undergraduate students or different tuition structures,

1   how the university came up with its tuition structures for

2   undergraduate students versus fee-based programs or those

3   kinds of things, to me, are not really relevant to this

4   determination because the allegation is that based on -- and

5   proof will be whether the individual -- whether the class

6   members did not receive the benefit of their bargain.

7                   And -- and so it will be based on tuitions

8   paid and whether or not they received that value.  And so how

9   the tuitions were calculated or the differences between

10  different programs really isn't at issue here.  It will --

11  the -- the question is -- is whether they -- the Plaintiff

12  can adequately represent those issues, and -- and here I

13  think he can.  There has not been shown that there is any

14  conflict of interest between his interest in vigorously

15  pursuing these claims.  His interest in -- in having the --

16  the various legal issues proven is the same as it would be

17  for other students.  There is not really any opposition

18  that's been raised to his -- demonstrated.

19                  He has -- has testified that he is committed

20  to and will vigorously represent these interests and there

21  hasn't been any challenge as to the qualifications of class

22  Counsel and their ability to vigorously represent the

23  interests of class members.  And so here I also find that the

24  requirement of 23(a)(4), that the representative Plaintiff

25  can fairly and adequately protect the interests of the class

1    has been met.

2                So I'm turning to 23(b), which is where I -- I

3    think really the bulk of the university's arguments have been

4    directed.  And 23(b) is that if there are common questions of

5    law predominate over the questions affecting only individual

6    members of the class, then that class action, therefore, is a

7    severely superior method to handle these claims.  The

8    university spends a lot of time arguing in its surreply that

9    the methodology proposed by the Plaintiffs to calculate

10   damages is inherently flawed and thereby fails to account for

11   the many differences between class members and -- and because

12   of that, the Court cannot find that common issues predominate

13   as required in 23(b) and arguably in 23(a) as well, that

14   there's really no way to measure the harm here, given that

15   there's no reliable starting point for -- for valuing an

16   individual student's educational experience as

17   Ms. Johnson-McKewan mentioned -- that each student invests

18   what they invest in an education, and the value they receive

19   sometimes isn't known until many years later and that -- and

20   that that requires individualized determinations of fact.

21               Again, I think that -- that the university may

22   be straying into factual issues here that will -- can be

23   argued on the merits that the -- the Plaintiffs will need to

24   prove the fact of damages and a reasonable method to

25   calculate it.  They can't be speculative.  And so many of the

1    issues that have been raised in terms of the flaws in

2    Dr. Cowan's report or the issues, again, going to differences

3    between tuition based and fee based or how an individual

4    might value their own educational experience are -- are

5    merits questions that can be raised during any trial to

6    defeat the Plaintiff's claims in terms of the jury's

7    determination as to whether they have -- the Plaintiffs have

8    established the fact of damages and in a -- and that they can

9    be determined in a nonspeculative way.

10            I -- I think Dr. Cowan's report does provide a

11   methodology, a predictable or a logical methodology for

12   calculating the difference between what was charged and --

13   and, more precisely, what the students paid and the value

14   they received.  And it -- and that methodology can be applied

15   across the board to all students, again, as tied to the legal

16   claims that -- that have been raised and the course of

17   conduct by the University of Washington that is alleged.

18            And so this really goes to is -- is there a

19   contract, and does the contract require the things that the

20   Plaintiff alleges it does?  And so, again, I think many of

21   these issues are -- are in the weeds at a -- at a level that

22   the Court is not required to determine at this point.

23            The question really here on 23(b) is whether

24   there is a common nucleus -- nucleus of operative facts to

25   show that that common nucleus of fact predominates.  And --

1    and, again, I -- I think that there -- there is because it is

2    based on this structure, this scaffolding of the legal claims

3    of valuing what bargain the students thought they were paying

4    for and -- and the value of what they received, and -- and

5    each of those specific factors will need to be established

6    before a jury by agreement of the parties, but it will need

7    to be established.  It's not established by virtue of class

8    certification.  I -- I don't -- I -- I think it is

9    established -- I believe it is established in this case that

10   class certification is -- would be superior to any other

11   method of adjudication.

12            As noted, the individual claims are far too

13   numerous to be brought individually.  There does not appear

14   to be any interest in individuals in bringing these claims,

15   and, in fact, some students may have withdrawn or may not

16   have renewed their registration when programming was changed

17   to remote programming.

18            And -- and so, you know, some of those issues

19   have -- already may have been resolved on a case-by-case

20   basis.  As far as I'm aware, neither party brought to the

21   Court's attention any similar litigation having been

22   commenced, and it certainly is desirable to keep the

23   litigation in -- in this locality in King County where the

24   University of Washington is primarily based and -- and many

25   of the students, certainly the in-person students, would be

1    in this area or were in this area at -- at the time the

2    issues arose.

3              And -- and another aspect of this

4    determination is whether -- whether class adjudication is

5    preferable.  There's difficulties that might be encountered

6    in the management of the class.  And the Plaintiffs have

7    raised and, in fact, it's been identified in some of the --

8    in at least one of the 30(b)(6) depositions.  I didn't know

9     -- I think it was a woman that was testifying that -- that

10   the students who would fall into the definition of the class

11   who -- who registered and paid in person during the relevant

12   time period can be found in university records and -- and

13   databases.  That there is a variation, perhaps, in the

14   damages that individual students may have incurred doesn't in

15   and of itself mean that the class can't be managed.  There

16   are tools that are available to differentiate between large

17   segments of class members.

18              There -- there can be subclasses that are

19   created.  There can be bifurcation or, in fact, the

20   methodology that is proposed by Dr. Cowan is not cast in

21   stone at this point.  It really isn't.  The -- although the

22   Court needs to determine that there is a -- a way that is

23   available to value any damages that is applicable to the

24   class, the fact that there is some individual variation is

25   not a reason to find that the -- the common structure of the

1    case, both the allegations and the determination of damages,

2    is -- predominates and applies to -- to all class members.

3                    And so while I find that there may well be

4    good reason for setoffs or that some class members, as

5    Ms. Johnson-McKewan has noted, may -- based on what they paid

6    and the valuation that's ultimately used in valuing what they

7    received may have no damages, that -- that those kinds of

8    variations can be addressed through management procedures and

9    class administration which is not determined at this point.

10   And so I do find that the class should be and will -- will be

11   certified.

12                   There was a question, and Mr. Kurowski raised

13   it as to whether or not the Court is required to determine

14   that the class is ascertainable, and I frankly don't know if

15   I'm required to do it or not.  But as I -- as I mentioned, I

16   think it is ascertainable and that the only information

17   before the Court at this point is that the university does

18   have records by which the class can be identified.  It has

19   contact information for class members through class

20   administration, the majority certainly of the class, and then

21   there are other mechanisms for contacting potential class

22   members can certainly be ascertained without major difficulty

23   other than the fact that we're talking about a very large

24   class here.

25                   Having granted the motion to certify the

1    class, I also find that Mr. Barry is an adequate class

2    member.  He has demonstrated -- and that really hasn't been

3    challenged -- that he will vigorously defend the interests of

4    the class.

5              I also will appoint the nominated class

6    Counsel of Hagens Berman Sobol and Shapiro and Lynch

7    Carpenter as class Counsel.

8              Their firm resumes have been provided.  They

9    each are highly experienced class Counsel and are actively

10   litigating these same claims in other parts of the country,

11   and -- and their qualifications to act as class Counsel have

12   certainly not been challenged by the Defendant either.

13             So two questions:  One is are there any

14   questions about my ruling on class certification?  I will

15   incorporate my oral ruling in an order that I'll get out

16   before the end of the week.  But as I said, I -- I'm not sure

17   I would have been able to make all of these findings in a

18   cogent written order if I hadn't provided you my oral ruling.

19             And then, in addition to any questions you

20   might have about my oral ruling, do we need to set a schedule

21   for things that will transpire with a new judicial officer?

22   And -- and my successor has been named and will step in and

23   carry on with this case, and that is William Dixon.  I don't

24   think he's been sworn in yet, but he -- he will be occupying

25   this department and will be assigned the cases that are

1    assigned to this department.

2                      And so I'm just wondering if -- if other dates

3    have -- and I could have checked the calendar, but I

4    didn't -- if other dates have already been established by

5    agreement of the parties or if there is a next date that is

6    impending, given my ruling, that it would be good for us to

7    address this when and how it will be set.

8                      MS. JOHNSON-MCKEWAN:  Your Honor, I -- I --

9    I'll address your first invitation which is to ask a

10   question.

11                     THE COURT:  Yes.

12                     MS. JOHNSON-MCKEWAN:  You offered some

13   comments about Dr. Cowan's opinions, and -- and I -- I didn't

14   take down your comments verbatim, but it -- it sounded to me

15   like you were finding -- well, I wanted to make sure that you

16   do not intend, by your comments today, to find that he --

17   that his expert report is reliable and admissible, et cetera,

18   that it is -- that you're not foreclosing a potential

19   challenge down the road to the admissibility or the propriety

20   of Dr. Cowan's opinions.

21                     THE COURT:  That's right.  I -- I think at

22   this point it really is not required that there be expert

23   testimony or -- on these issues.  My finding is only that

24   there has been proposed a logical and -- methodology for

25   evaluating the -- what the students bargained for and the

1   value they received, and -- and Dr. Cowan's report is

2   certainly an example of that but not that it's -- that -- not

3   that I'm establishing its admissibility or its control over

4   these issues.

5               MS. JOHNSON-MCKEWAN:  Thank you, Your Honor.

6   And then with respect to dates, Counsel and we have not

7   discussed this.  I -- I think it might be appropriate for us

8   to have a -- a conversation offline about what an appropriate

9   follow up schedule is and then schedule something with your

10  successor at an early date to work out the plan for the rest

11  of the case.

12              THE COURT:  Mr. Kurowski?

13              MS. JOHNSON-MCKEWAN:  But that's -- that's my

14  observation, and I haven't discussed it with Mr. Kurowski; so

15  I'll -- I'll leave it to him then.

16              MR. KUROWSKI:  Yes.  Certainly we're willing

17  to discuss any -- any dates with -- with Counsel.  We do have

18  a full schedule in this case.  You know, I think whether and

19  to what extent that does or should change, based on this

20  Court's ruling right now, that is -- is definitely something

21  that, you know, if Defendant wants to have that conversation,

22  we'll explore with them in good faith.

23              I think in terms of one additional issue for

24  us with Your Honor certifying the class -- one of the things

25  that we'll have to do is issue notice to the class.  So,

1   really, if there's a schedule to be hashed out above and

2   beyond, you know, even if we were to keep the schedule that

3   we have in place already, we would need a -- a schedule for

4   issuing notice; and we, of course, would need time to work

5   with the notice administrators, work with the university to

6   obtain email and contact and mail information as well.

7                  THE COURT:  Yeah.

8                  MR. KUROWSKI:  And -- and that was one of the

9   things that we had put in our proposed order was that --

10  directed the university to provide that information for the

11   -- the purpose of notice.

12                 THE COURT:  And that's really the kind of

13  thing that I was thinking about, that there are a number of

14  important interim steps, and the -- the standard case

15  management schedule is what governs at this point.  And you

16  all can, of course, confer and can always seek to modify it

17  or agree to modify it, but those interim steps may be time

18  consuming and takes some time to accomplish as well.

19                 So I'm going to take your questions and -- and

20  this discussion as we're going to sit tight for now and that,

21  as you further discuss the need for things, I -- I'll review.

22                 I confess, Mr. Kurowski, I haven't looked at

23  either party's proposed order; so I -- I don't know what the

24  specifics of that are.  I -- I will work with Plaintiff's

25  proposed order and interlineate.  And so if I need to cross

```
1    out things or if I need to add things that I think more --

2    give more detail to my findings, I'll interlineate with

3    those.

4              Can I just ask:  Do I have your order as a

5    Word document?

6              MR. KUROWSKI:  If the standard requires us to

7    submit it as a Word document, you, I'm sure, do.  I -- but I

8    -- I'm glad to send one to your courtroom deputy, Your Honor.

9    I'll -- I'll make sure to get it out just in case I have not.

10             THE COURT:  Yeah.  I'm -- I'm pretty sure I

11   do --

12             MR. KUROWSKI:  We have it.  I'll do it right

13   now.

14             THE COURT:  -- but if you could email me one,

15   it would help me a lot.  There is a lot going on, and I -- I

16   don't -- so that would be very helpful if you would just

17   email to my Ramseyer.Court email address, and I'll work with

18   that, and I will get that out today or before the end of the

19   week.

20             MR. KUROWSKI: We -- we will do just that.  And

21   thank you, Your Honor, for your time and -- and your ruling

22   and, you know, certainly from -- I speak on behalf of my

23   co-counsel, even though I haven't discussed it, you know, we

24   do wish you a -- a happy and well-earned retirement.  Thank

25   you.
```

```
 1                    THE COURT:  Thank you.

 2                    MR. CIOLKO:  Absolutely, Your Honor.

 3   Congratulations.  Vaya con Dios.

 4                    THE COURT:  Thank you very much.  And let me

 5   just say it has been such a privilege working with the Court

 6   but -- but especially working with talented and professional

 7   Counsel.  And I'm sorry I can't see your case to completion,

 8   but I want to thank all of you for the high level of skill

 9   and professionalism you bring to our profession.  It's so

10   important.  And thank you for your hard work.

11                    MS. JOHNSON-MCKEWAN:  Thank you, Your Honor.

12   And -- and best wishes to you.  Enjoy your retirement.

13                    THE COURT:  Thank you.  All right.  I will be

14   getting out an order.  You know how to follow up, should that

15   be required, and I wish you all the very best.

16                    MS. JOHNSON-MCKEWAN:  Thank you.

17                    THE COURT:  We will be at recess.

18   (Proceedings concluded at 10:31:39 a.m.)

19

20

21

22

23

24

25
```

1                    <u>CERTIFICATE OF TRANSCRIBER</u>

2

3           I, Deborah Anderson, a court-approved

4    transcriber, certify that the foregoing is a full, true,

5    and correct transcript, transcribed to the best of my

6    ability from the official electronic sound recording of

7    the proceedings in the above-entitled matter;

8               That I am neither an attorney, not employed by,

9    related to, nor of counsel for any of the parties named

10   herein, nor otherwise interested in the outcome of this

11   action.

12              IN WITNESS WHEREOF, I have hereunto sent my hand:

13

14

15   _____

16   Deborah Anderson, CET-998

17   Anderson Transcription Solutions LLC

18   335 W Middle Road

19   Lykens, PA 17048-8823

20   704.840.9351

21

22   Date:  August 31, 2023

23

24   AAERT Certification effective until February 25, 2024

25